

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-24-00061-CV

———————————————

DAVID DARRIGAN, Appellant

V.

THE AMERICAN PROSPECT, INC., MAUREEN TKACIK, DAVID DAYEN,
AND GREG HANSEN, Appellees

---

On Appeal from the 431st District Court
Denton County, Texas
Trial Court No. 23-7737-431

---

Before Sudderth, C.J.; Birdwell and Walker, JJ.
Memorandum Opinion by Justice Birdwell

# MEMORANDUM OPINION

This case involves the Texas Citizens Participation Act (TCPA). *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 27.001–.011. Appellant David Darrigan sued The American Prospect, Inc., Maureen Tkacik, David Dayen (collectively, Prospect), and Greg Hansen for defamation following the publication of an article by Prospect.[1] Prospect and Hansen filed TCPA motions to dismiss, and the trial court granted the motions and awarded both attorney's fees and sanctions. Darrigan contends that both the dismissal under the TCPA and the award of attorney's fees and sanctions were error. Because we will conclude that Darrigan did not establish by clear and specific evidence a prima facie case as to each of his claims, we will hold that Prospect and Hansen were entitled to a dismissal under the TCPA and that the trial court did not err in awarding attorney's fees and sanctions.

## I. Background

In 2019, American Physician Partners (APP) purchased an emergency room (ER) staffing company where Darrigan was employed. After the sale, Darrigan served as a regional medical director for APP, overseeing the staffing of hospital ERs. Darrigan's testimony is that he was against joining APP but continued to work there until March

---

[1]Darrigan also alleged several other causes of action and theories of liability or recovery against all named defendants: tortious interference with prospective relationships, business disparagement, negligence, intentional infliction of emotional distress, conspiracy, ratification, and aiding and abetting.

2023.[2] Following his resignation from APP, Darrigan started a new management company called Elite Hospital Partners (Elite). According to Darrigan, he then began discussions with several hospitals to have Elite take over their ER staffing.

On July 29, 2023, The American Prospect, Inc. published an article (the Article) written by Tkacik, detailing the fall of APP: "Shock Treatment in the Emergency Room: The Lehman-like collapse of a(nother) private equity-owned ER operator has physicians calling louder than ever for a strike." According to the Article, APP staffed approximately 135 hospital ERs and "freestanding" ERs in 18 states. Tkacik stated in the Article that she spoke with seven emergency room physicians, and they told her that it was common for "ownership transitions" to occur but that this was "unlike anything" they had experienced before.

In early July 2023, APP told physicians that the company was being acquired by another company, and then on July 17, APP claimed that the "deal . . . was off" and that it no longer had the liquidity to continue operations. When the Article was first published less than two weeks later, APP had not yet filed for bankruptcy, and multiple rumors were circulating that physicians may not be paid for work done in June or July. The Article detailed additional issues stemming from APP's collapse, such as the lack of sponsorship of work visas for international clinicians and the loss of malpractice insurance.

---

[2]Emails Darrigan's attorney sent to Tkacik stated that Darrigan resigned on June 5, 2023.

Along with those issues, the Article indicated that, because APP's collapse had abrogated its physician contracts, some hospitals and mega-practices had begun to exploit the ensuing panic, inducing doctors to sign new contracts without negotiations. Tkacik shined a spotlight on APP's three founders and concluded that APP was a victim of its own unprofessionalism and "frat house culture." After discussing APP's three founders, Tkacik made several statements about Darrigan.

The Article reported that Darrigan was one of APP's "favored insiders" and "rose through the ranks at the company despite a controversial side gig running two cafés that sell drinks spiked with the mood-altering herbs known as kratom and kava."[3]

---

[3] The word "controversial" appears to be hyperlinked (it is underlined) in the printout of the Article filed with Darrigan's petition, and allegedly the hyperlink opened to a five-page Word document with an unsigned letter to the American Board of Emergency Medicine (ABEM), detailing concerns about Darrigan's ownership of kava cafés, the dangers of kava, delta-8 THC, and kratom, along with the author's opinion that Darrigan's "promotion" of the substances is "unbecoming of an ABEM member" and a physician.

Kava is "an Australasian shrubby pepper (*Piper methysticum*) from whose crushed root an intoxicating beverage is made; the dried rhizome and roots of the kava used especially as a dietary supplement chiefly to relieve stress and anxiety." *Kava*, Merriam-Webster's Online Dictionary, https://www.merriam-webster.com/dictionary/kava (last visited Aug. 12, 2025). "Kratom is a tropical tree native to Southeast Asia. Consumption of its leaves produces both stimulant effects (in low doses) and sedative effects (in high doses), and can lead to psychotic symptoms, and psychological and physiological dependence. Kratom leaves contain two major psychoactive ingredients (mitragynine and 7-hydroxymitragynine). These leaves are crushed and then smoked, brewed with tea, or placed into gel capsules." *See Drug Fact Sheet: Kratom* (Apr. 2020), https://www.dea.gov/sites/default/files/2020-06/Kratom-2020_0.pdf; *see also A.B. v. Tex. Dep't of Fam. and Protective Servs.*, No. 03-22-00759-CV, 2023 WL 3235814, at *3 n.5 (Tex. App.—Austin May 4, 2023, no pet.) (mem. op.) (recounting testimony concerning

4

This was followed by a parenthetical indicating that a kava bar franchisor had sued Darrigan "for stealing its trade secrets." According to the Article, Darrigan's "upstart ER practice" had "recently secured" a former APP contract to staff Comanche County Memorial Hospital (CCMH) in Oklahoma. Immediately following this statement, a source commented that "such 'insider deals' [had] led some physicians to suspect the desire to discreetly award plum contracts to company 'favorites'" may have been responsible for APP's delayed bankruptcy filing.

The day after the Article was published, Darrigan's attorney, Adam Allen, emailed Tkacik to "clear up the [inaccurate] reporting" in the Article. According to Allen, Darrigan had first sued franchisor Kava Culture in April 2023 for "fraudulent inducement[] and violations of many consumer protection statutes and . . . a few criminal statutes." Darrigan's lawsuit was still pending when the Article was published. Allen claimed that Kava Culture then "responded" to Darrigan's lawsuit with one of its own, claiming that Darrigan stole trade secrets. Allen also explained that Kava Culture's lawsuit had been dismissed in May 2023, but Kava Culture had refiled in a Florida state

---

father's drug use in termination proceed, including positive drug test for kratom, which described kratom as a substance with "opioid-like effects" that in higher doses is mind-altering).

5

court a week later. The email requested that Tkacik include "these facts as an update to [her] article."[4] Tkacik and Allen also spoke on the phone about the Article.

The Article was updated around July 31, or August 1, 2023, to remove the hyperlink to the Word document and to add information regarding the Kava Culture lawsuits. On August 23, 2023, Allen sent a letter to The American Prospect, Inc. in Washington, D.C., complaining about the depiction of Darrigan in the Article. The letter claimed that "[a]lthough the preponderance of the [A]rticle focused on the seemingly immoral behavior of APP and its potentially questionable business tactics," it also "took an odd detour" when it made "unrelated accusations against [Darrigan]." The letter served as Darrigan's "final demand for a retraction of the entirety of the statements concerning him." Prospect claims that the failure to address the letter to a person—it was addressed to "Publisher"—caused Prospect to be unaware of the demand until after the lawsuit had been filed.

---

[4]Allen later emailed Tkacik again to request changes to the Article—denying that Darrigan was an "insider of APP" or had received any APP contracts and disputing that Darrigan had secured the CCMH contract "earlier this year" as alleged in the Article. Allen also complained that the "Word doc draft alleging [Darrigan's] lack of fitness to be a medical doctor" was still on the website. Tkacik stated that she did not receive the subsequent emails due to a server error that she had informed Allen about when they spoke on the phone.

Shortly thereafter, on August 31, 2023, Darrigan sued Prospect and Hansen.[5] Tkacik identified Hansen as one of the sources for the Article, and Darrigan believed Hansen wrote the letter to ABEM that was hyperlinked in the original Article. Darrigan also alleged that Hansen harbored a grudge against him. Darrigan's original petition included nine causes of action and theories of liability: slander, libel, tortious interference with prospective relationships, business disparagement, negligence, intentional infliction of emotional distress, conspiracy, ratification, and aiding and abetting.

Prospect then filed a motion to dismiss under the TCPA on all Darrigan's alleged causes of action.[6] Prospect denied Darrigan's defamation claims, stating that the Article was merely "truthful and accurate reporting regarding matters of significant public concern." Prospect's TCPA motion to dismiss argued that the statements about Darrigan were only a small part of the Article—contained in "a single paragraph near the end of a 2,800-word article"—and were accurately represented based on Tkacik's thorough research. According to Prospect, the Article's reporting on matters of public concern were "exactly" what the TCPA was enacted to protect. Prospect also contested

---

[5]Arthur Smolensky—another of Tkacik's sources—was also named as a defendant but was non-suited with prejudice prior to the TCPA motion to dismiss hearing.

[6]Prior to filing the TCPA motions to dismiss, both Prospect and Hansen filed answers with special exceptions and affirmative defenses, identifying that there was a TCPA issue.

the remainder of Darrigan's causes of action, calling them "tag-along" claims. Prospect argued that because these claims were based on the same article that gave rise to the defamation claims, the fair report and fair comment privileges and the third-party allegation rule would apply.

Hansen filed a "Joinder in Prospect Defendants' Motion to Dismiss Claims Pursuant to the Texas Citizens Participation Act." In his motion, Hansen "adopt[ed] and incorporate[d] by reference the Prospect Defendants' Motion to Dismiss." Hansen claimed that any statements he made were not capable of defamatory meaning because "they are substantially true and/or constitutionally protected opinions." Additionally, Hansen—like Prospect—argued that Darrigan's additional causes of action failed because the claims were based on the defamation claim and Darrigan could not prove damages.

Darrigan filed a response to the TCPA motions to dismiss, along with fifteen declarations and four additional exhibits. Darrigan argued that the overall gist of the Article—coupled with the specific statements about him—tarnished his reputation and caused him to lose a substantial amount of money. Darrigan took specific issue with the allegations (1) that he was an insider who rose through the ranks at APP, (2) that he acquired the contract with CCMH as a result of this insider status, and (3) that he sold "spiked" drinks at his kava bar or stole trade secrets. Darrigan claimed that the Article damaged his reputation, and that because his occupation was connected to his reputation, the statements caused financial loss as well.

8

The trial court heard the TCPA motions to dismiss on December 20, 2023. Before the hearing, Prospect filed a reply to Darrigan's response, along with objections to, and a motion to strike, each of the fifteen declarations attached to his response. According to Prospect, the declarations were inadmissible because several of the statements violated the Texas Rules of Evidence. Darrigan responded to the objections and requested leave to amend the declarations. The trial court overruled Prospect's objections and denied the motion to strike. The trial court also denied Darrigan's request to amend the declarations, stating that it would "consider them all for what they are."

Following the hearing, the trial court granted both Prospect's and Hansen's TCPA motions to dismiss, disposing of all claims, theories of liability, and parties. The trial court later awarded attorney's fees and sanctions against Darrigan to both defendants. This appeal followed.

Darrigan raises seven issues on appeal.[7] Because many of the issues overlap, we have consolidated our discussion of the issues into three sections: (1) evidentiary challenges—issues one and two; (2) the TCPA motions to dismiss—issues three, four,

---

[7]The seven issues Darrigan alleges are (1) whether the trial court abused its discretion by excluding Darrigan's corrected declarations; (2) whether the trial court implicitly granted Prospect's objections to Darrigan's original declarations; (3) whether the trial court erred by granting Hansen's Anti-SLAPP joinder motion; (4) whether the trial court erred by "granting Appellees' TCPA motions to dismiss"; (5) whether there was "legally and factually sufficient evidence to grant Appellees' TCPA motion"; (6) whether there was legally and factually sufficient evidence to award attorney's fees and sanctions to Appellees; and (7) whether the trial court abused its discretion by granting the TCPA motions and awarding attorney's fees and sanctions.

and five; and (3) the TCPA award of attorney's fees and sanctions—issues six and seven.

## II. Evidentiary Challenges

Darrigan argues in his first and second issues that the trial court impermissibly denied him the opportunity to correct or amend the declarations submitted with his response to the TCPA motions to dismiss.

### A. Standard of Review

We review a trial court's rulings in admitting or excluding evidence for an abuse of discretion. *Fleming v. Wilson*, 610 S.W.3d 18, 21 (Tex. 2020). We must uphold the trial court's evidentiary ruling if the record shows any legitimate basis for the ruling. *Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998).

### B. Discussion

Darrigan claims that the trial court not only denied his amendments, but by doing so, implicitly denied his originally filed declarations. But this misinterprets the trial court's ruling. Prospect filed objections to each of the attached declarations, along with a motion to strike. Then, presumably in response to the raised objections to the declarations, Darrigan requested leave to amend or correct the errors. The trial court overruled all of Prospect's objections as well as the motion to strike. The trial court also

denied Darrigan's request to amend.[8] Regarding the original declarations filed, the trial court stated that it would "consider them all for what they are." The declarations that Darrigan filed and those he sought to file as amendments are substantially the same, save for the objected-to phrase that some of the statements were not based on the declarant's personal knowledge, but on the "true and correct documents and testimony already before the court."

Darrigan argues that the written ruling on Prospect's motion to strike includes language that implicitly excluded all the declarations because the motion had stated the trial court would "consider [the] probative value" of the evidence, "as appropriate, in accordance with the Texas Rules of Evidence." Darrigan points to Rule 602 of the Texas Rules of Evidence which states that "[a] witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal

---

[8]The order denying Darrigan's request to amend the declarations states that the trial court "declines to consider any pleadings, motions or evidence filed after December 17, 2023, in accordance with Local Rule 1.12." The text of Local Rule 1.12 does not appear in the record, but we may take judicial notice of information contained on a governmental website. *See In re Reed*, No. 02-22-00113-CV, 2022 WL 1405520, at *9, n.1 (Tex. App.—Fort Worth May 4, 2022, orig. proceeding) (citing *City of El Paso v. Fox*, 458 S.W.3d 66, 71–72 (Tex. App.—El Paso 2014, no pet.)). Local Rule 1.12 concerns the submission of briefs in relation to a scheduled hearing. *See* Rule 1.12, *Uniform Rules of Court for the District and Statutory County Courts of Denton County, Texas*, (Feb. 27, 2025), https://www.dentoncounty.gov/DocumentCenter/View/957/Uniform-Rules-of-Court-for-the-District-and-Statutory-County-Courts-of-Denton-County-Texas-PDF. Darrigan's request to amend was not related to a brief, but to declarations. Because we must uphold a trial court's evidentiary ruling if there is any legitimate basis for the ruling, we decline to consider the applicability of Local Rule 1.12 under these circumstances. *See Malone*, 972 S.W.2d at 43; *see also* Tex. R. App. P. 47.1.

11

knowledge of the matter." Tex. R. Evid. 602. Statements of personal knowledge cannot be conclusory and must "furnish some factual information that could have been rebutted." *La China v. Woodlands Operating Co., LP*, 417 S.W.3d 516, 520 (Tex. App.—Houston [14th Dist.] 2013, no pet.) (discussing statements made with personal knowledge in affidavits for consideration of a summary-judgment award).

Upon our review of the evidence, it is clear what statements are based on personal knowledge and which are not.[9] *Id.* (holding conclusory statements fail to provide underlying facts to support the conclusion (citing *LeBlanc v. Lamar State Coll.*, 232 S.W.3d 294, 301 (Tex. App.—Beaumont 2007, no pet.))). The trial court is permitted to consider those statements that are demonstrably made with a declarant's personal knowledge. *See Williams v. Conroe Indep. Sch. Dist.*, 809 S.W.2d 954, 958–59 (Tex. App.—Beaumont 1991, no writ) (holding that in the absence of a proper averment of truth and personal knowledge in an affidavit, the trial court may only consider those statements that are in the "inherent" personal knowledge of the declarant).

---

[9]Some examples of statements made without personal knowledge are as follows: "I can only assume the decision was made based on the bad press"—with no additional support; "Anyone that read the [Article] would believe Darrigan was a nut job"—with no evidence to support that someone else did believe this and the declarant even stating that he disagreed with the Article; "I am unaware of all the financial and professional implications . . . , but I imagine that it would be substantial"—with no additional support.

Moreover, Darrigan's first filed declarations were substantively the same as the amended declarations.[10] Thus, the trial court did not abuse its discretion in preventing Darrigan from submitting amended declarations. Additionally, Darrigan does not point to anything to show, and the record also does not support, that the trial court did not consider the declarations Darrigan first filed.[11] Accordingly, because we do not conclude that the trial court abused its discretion in denying Darrigan the opportunity to amend his declarations, we overrule Darrigan's first and second issues.

### III. The TCPA Motions to Dismiss

A. Standard of Review

We review a trial court's grant of a TCPA motion to dismiss de novo. *USA Lending*, 669 S.W.3d at 200. We consider the pleadings, the evidence a trial court could consider under Rule 166a, and any supporting and opposing affidavits. Tex. Civ. Prac. & Rem. Code Ann. § 27.006(a). We view the pleadings and evidence in the light most favorable to the nonmovant. *Miller v. Watkins*, No. 02-20-00165-CV, 2021 WL 924843, at *8 (Tex. App.—Fort Worth Mar. 11, 2021, no pet.) (mem. op.) (citing *Robert B. James, DDS, Inc. v. Elkins*, 553 S.W.3d 596, 603 (Tex. App.—San Antonio 2018, pet. denied)).

---

[10]Some of the proposed amendments still contain the improper language that the declaration was made "based on the true and correct documents and testimony already before the court"—which does not constitute personal knowledge.

[11]Further, even if the trial court did not review the evidence, as we will explain, we must review a dismissal under the TCPA de novo—and thus, we have reviewed the declarations. *See USA Lending Grp., Inc. v. Winstead PC*, 669 S.W.3d 195, 200 (Tex. 2023).

B. Applicable Law

"The TCPA is popularly known as the Texas Anti-SLAPP statute, referring to Strategic Lawsuits Against Public Participation." *Bookout v. Shelley*, No. 02-22-00055-CV, 2022 WL 17173526, at *10 (Tex. App.—Fort Worth Nov. 23, 2022, no pet.) (mem. op.). The TCPA protects citizens from retaliatory lawsuits that seek to intimidate or silence them on matters of public concern and provides the procedure for the expedited dismissal of such lawsuits. *In re Lipsky*, 460 S.W.3d 579, 586 (Tex. 2015) (orig. proceeding). The purpose of the TCPA is "to encourage and safeguard the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government to the maximum extent permitted by law and, at the same time, protect the rights of a person to file meritorious lawsuits for demonstrable injury." Tex. Civ. Prac. & Rem. Code Ann. § 27.002.

The TCPA employs a three-step process to determine whether a claim is subject to dismissal. *See McShirley v. Lucas*, No. 02-23-00229-CV, 2024 WL 976512, at *3 (Tex. App.—Fort Worth Mar. 7, 2024, pet. denied) (mem. op.). First, the party invoking the TCPA must demonstrate that the legal action against it is "based on or is in response to" (1) the party's exercise of the rights of free speech, to petition, or of association protected under the TCPA or (2) "the act of a party described by Section 27.010(b)." Tex. Civ. Prac. & Rem. Code Ann. § 27.005(b). Second, if the moving party meets its initial burden, the burden then shifts to the nonmoving party to show by clear and specific evidence a prima facie case for each essential element of its claim. *Id.*

14

§ 27.005(c). If neither the pleadings nor the evidence can show the requisite details, the nonmovant fails to meet his burden, and the movant is entitled to a dismissal. *Stickland v. Schlegel*, No. 02-22-00281-CV, 2023 WL 8112889, at *19 (Tex. App.—Fort Worth Nov. 22, 2023, pet. denied) (mem. op.) (citing *NexPoint Advisors, L.P. v. United Dev. Funding IV*, 674 S.W.3d 437, 446–47 (Tex. App.—Fort Worth 2023, pets. denied)). Finally, if the nonmoving party satisfies the step-two requirement, the burden then shifts back to the movant to establish "an affirmative defense or other grounds on which the moving party is entitled to judgment as a matter of law." Tex. Civ. Prac. & Rem. Code Ann. § 27.005(d). We employ the same three-step analysis in reviewing a trial court's ruling on a TCPA motion to dismiss. *See Youngkin v. Hines*, 546 S.W.3d 675, 679 (Tex. 2018).

C. Prospect

Darrigan's fourth and fifth issues challenge the trial court's grant of the Appellees' motions to dismiss, claiming that the evidence was not sufficient to do so. We first address these issues as to Prospect.

Prospect contends that each of Darrigan's claims fall within the purview of the TCPA because it is a media company and was reporting on a matter of public concern for the community. Prospect claims the Article "detailed the impending demise of [APP], one of the nation's largest employers of [ER] doctors," and that it reported "on the concerns of ER doctors as APP collapsed, including questions about why APP was delaying its bankruptcy filing, who would take over APP's existing [ER] contracts, and

15

how physicians could secure critical insurance coverage that had previously been provided by APP."

Darrigan's original petition claimed that various statements in the Article painted him in an unfavorable light, insinuating that he was "drugging his clientele without their consent, hurting his customers, being unethical in his medical . . . and his business practices, and being an insider of a corrupt company." Specifically, Darrigan complains about three "categories" of statements in the Article: the portrayal of the kava bars he owned (that he was selling spiked drinks),[12] the theft of trade secrets and pending litigation related to the kava bars, and the characterization of him as an "insider" at APP who "rose through the ranks." Darrigan also takes issue with what he believes is the insinuation that his "insider" status was somehow responsible for his securing the contract to staff CCMH.

1. Step One

The first step is to determine the TCPA's applicability. *See* Tex. Civ. Prac. & Rem. Code Ann. § 27.005(b). Prospect will have met this initial burden if it can show that Darrigan's suit is based on or in response to the exercise of free speech—as claimed in this case. *Id.*

---

[12]As related to the portrayal of the kava bars, Darrigan also references the Word document that he claims Hansen wrote. Because the complaint is also about Darrigan's association with selling kava drinks, we discuss the Word document and the Article together for the purpose of step one.

16

To determine if the Article is an exercise of free speech under Chapter 27, we look to the language of the statute. Prospect argues that the Article is an exercise of free speech on matters of concern and significant interest to the public—specifically, the staffing and operation of hospital ERs and the distribution and endorsement of mood-altering substances by a physician.

Matters of public concern constitute the exercise of the right of free speech under the statute. *Id.* § 27.001(3). A "matter of public concern" is a statement or activity regarding a public official, public figure, or person who has drawn substantial public attention[13]; a matter of political, social, or other interest to the community; or a subject of concern to the public. *See id.* § 27.001(7)(A)–(C).

Courts have held that the provision of medical services by health care professionals are matters of public concern. *See Lippincott v. Whisenhunt*, 462 S.W.3d 507, 510 (Tex. 2015); *Oncology-Hematology Consultants v. Locke*, No. 14-21-00733-CV, 2023 WL 166309, at *5 (Tex. App.—Houston [14th Dist.] Jan. 12, 2023, no pet.) (mem. op.); *Pisharodi v. Columbia Valley Healthcare Sys., L.P.*, 622 S.W.3d 74, 82–83 (Tex. App.— Corpus Christi–Edinburg 2020, no pet.). Further, "when a health care provider engages in communications relevant to an employee's ability to safely and competently provide

---

[13]Prospect claims—and Darrigan disputes—that Darrigan is a limited-purpose public figure. Because we will determine that the statements made are subjects of concern to the public under Section 27.001(7)(C), we need not decide if Darrigan is a public figure or not. *See* Tex. R. App. P. 47.1 ("The court of appeals must hand down a written opinion that is as brief as practicable," while still addressing all issues "necessary to final disposition of the appeal.").

medical services to patients, such communications relate to health and safety issues impacting the public and constitute matters of public concern." *Locke*, 2023 WL 166309, at \*5. Employing the same reasoning, we hold the reverse is also true: when a publication is made about an organization that staffs or provides medical care and services, such communications are related to health and safety issues that impact the public and constitute matters of public concern. Thus, the Article as a whole is about a matter of public concern. Consequently, the revelation that Darrigan's new company secured a contract to staff an ER that had been previously staffed by APP also constitutes a matter of public concern.

Likewise, we determine that the statements about Darrigan's ownership of kava bars and the related legal battle are also matters of public concern. According to Darrigan's own statements, he relied on his status as a physician to publicly endorse the consumption of kava and kratom—mood-altering substances—using that status to give credibility to the purported safety of ingesting the herbs.[14] While perhaps not a medical service in the traditional sense, Darrigan's reliance on his status as a physician makes this a matter of concern to the public—particularly if there are conflicting opinions

---

[14]The record includes a printout of an online blog post called "Meet Dr. David Darrigan of Kava Culture Denton." The section includes a statement that "Dr. Darrigan is being recognized for his outstanding contributions to the Texas kava bar scene." There is also a quote attributed to Darrigan that states, "As a physician, I did plenty of research to make sure everything I would be offering would be safe. . . . I feel completely comfortable offering these products and allowing a new way to be social, with a plant buzz."

about safe use. Additionally, the purported hyperlink to the ABEM letter of concern in the Article provided a conflicting view about the safety of the same substances that Darrigan was promoting and selling; thus, it also is a matter related to the health and safety of the public. *See Mem'l Hermann Health Sys. v. Khalil*, No. 01-16-00512-CV, 2017 WL 3389645, at *6 (Tex. App.—Houston [1st Dist.] Aug. 8, 2017, pet. denied) (mem. op. on reh'g) (holding that communications criticizing physician's competence were related to health and safety issues and made in connection with matter of public concern).

Accordingly, because Darrigan's suit is based on statements in the Article that are directly related to matters of public concern, we conclude—as the trial court did — that Prospect satisfied its initial burden under the TCPA. *See* Tex. Civ. Prac. & Rem. Code Ann. § 27.001(7)(C).

2. Step Two

Because Prospect established that Darrigan's suit was based on statements directly related to a matter of public concern, the burden then shifted to Darrigan to establish by clear and specific evidence a prima facie case for the essential elements of each of his claims. *See id.* § 27.005(c). A "prima facie case" refers to evidence that is legally sufficient to establish a given fact if it is not rebutted or contradicted. *Lipsky*, 460 S.W.3d at 590. "Conclusory statements are not probative and accordingly will not suffice to establish a prima facie case." *Serafine v. Blunt*, 466 S.W.3d 352, 358 (Tex. App.—Austin 2015, no pet.) (op. on reh'g). Bare or baseless opinions are no substitute

19

for clear and specific evidence, and "[o]pinions must be based on demonstrable facts and a reasoned basis." *Lipsky*, 460 S.W.3d at 592–93. "Clear" means "unambiguous, sure, or free from doubt," and "specific" means "explicit or relating to a particular named thing." *Id.* at 590 (internal quotation marks omitted). If a case fails on any essential element, dismissal is warranted under the TCPA. *See* Tex. Civ. Prac. & Rem. Code Ann. § 27.005(c); *see also NexPoint*, 674 S.W.3d at 445.

Darrigan brought claims of defamation, defamation per se, tortious interference with prospective relationships, business disparagement, negligence, and intentional infliction of emotional distress, along with the related theories of liability: conspiracy, ratification, and aiding and abetting, against Prospect. At the dismissal hearing, and on appeal, Darrigan focused on his defamation claims—which make up the foundation for his related claims and theories of liability. As a result, we first address Darrigan's defamation claims.

"The threshold question in a defamation case is whether the statement 'is reasonably capable of defamatory meaning.'" *Neurodiagnostic Consultants, LLC v. Villalobos*, No. 03-18-00743-CV, 2019 WL 4892220, at *3 (Tex. App.—Austin Oct. 4, 2019, no pet.) (mem. op.) (quoting *Hancock v. Variyam*, 400 S.W.3d 59, 66 (Tex. 2013)). This question involves two steps: (1) whether the meaning alleged by the plaintiff is reasonably capable of arising from the text, and, if it is, (2) whether that meaning is reasonably capable of defaming the plaintiff. *Dall. Morning News, Inc. v. Tatum*, 554 S.W.3d 614, 625 (Tex. 2018). "If the statement is not reasonably capable of a

20

defamatory meaning, the statement is not defamatory as a matter of law and the claim fails." *Villalobos*, 2019 WL 4892220, at *3 (citing *Hancock*, 400 S.W.3d at 66).

Darrigan alleges both "defamation per se" and "defamation per quod" claims. We note that the Texas Supreme Court has abandoned—other than for the purpose of presuming general damages—the categories of defamation per se and per quod as descriptors of whether a statement is defamatory. *See Bookout*, 2022 WL 17173526, at *17 (citing *Tatum*, 554 S.W.3d at 625–26). Defamation that arises from a statement's text *without* reference to extrinsic evidence is now "textual defamation," not "defamation per se." *Tatum*, 554 S.W.3d at 626. And defamation that *does require* reference to extrinsic evidence is now "extrinsic defamation," not "defamation per quod." *Id.*

### a. Textual Defamation

The Supreme Court in *Tatum* identified three ways, in a textual-defamation case, that a plaintiff may allege that a defamatory meaning arises. *Id.* at 628. First, the defamatory meaning may arise explicitly. *Id.* (citing *Bentley v. Bunton*, 94 S.W.3d 561, 569 (Tex. 2002) ("[Y]'all are corrupt, y'all are the criminals, [and] y'all are the ones that oughta be in jail.")). Second, the defamatory meaning may arise implicitly as a result of the gist of the entire article. *Id.* (citing *D Magazine Partners, L.P. v. Rosenthal*, 529 S.W.3d 429, 439 (Tex. 2017) ("[E]valuating the article 'as a whole . . . ' the article's gist is that . . . ." (citation omitted))). Third, the defamatory meaning may arise implicitly from a distinct portion of the article rather than from the gist of the entire article. *Id.*

21

Darrigan makes two textual defamation arguments against Prospect: (1) that the Article explicitly accuses him of criminal activity and (2) that the gist of the Article was defamatory. We address each in turn.

i. Explicit

Darrigan claims the statement that his "controversial side gig running two cafés that sell drinks spiked with the mood-altering herbs kratom and kava" alleges a criminal act—and thus constitutes defamation per se.[15] We disagree with this characterization of the statement in the Article, and thus, with Darrigan's conclusion.

Historically, defamation per se—now textual defamation—had to fall within one of four categories: (1) imputation of a crime; (2) imputation of a loathsome disease; (3) injury to a person's office, business, profession, or calling; or (4) imputation of sexual misconduct. *Bookout*, 2022 WL 17173526, at *14 (citing *Gray v. HEB Food Store No. 4*, 941 S.W.2d 327, 329 (Tex. App.—Corpus Christi–Edinburg 1997, writ denied)). Under *Tatum*, a statement that imputes the commission of a crime constitutes textual defamation regardless of whether extrinsic evidence is required to show its defamatory meaning. *See Tatum*, 554 S.W.3d at 625–26, 638. If a statement is defamatory per se, damages are presumed. *Bookout*, 2022 WL 17173526, at *19 (noting that the *Tatum* court did not abandon the distinction between defamation per se and defamation per quod in the calculation of damages).

---

[15]Darrigan uses "defamation per se" in his argument, which we characterize as "textual defamation" under the guidelines set forth in *Tatum*.

But before one can accuse another of committing a crime, the crime must, in fact, exist. Darrigan implicitly concedes this point by claiming that, by employing the word "spiked" in describing the drinks he sells at his kava bars, the Article accused him of the offense set forth in Section 22.09 of the Texas Penal Code, namely, tampering with a consumer product.[16] We disagree. Section 22.09 does not use the word "spiked," and the Article makes no allegation that Darrigan "tampered" with the drinks being sold at his kava bars.

Moreover, "spiked" and "tampered" are not necessarily synonymous terms. Under the statute, "tamper" means "to alter or add foreign substance to a consumer product to make it probable that the consumer product will cause serious bodily injury." Tex. Penal Code Ann. § 22.09(a)(2). Because "spiked" is not used in the statute, it is not defined there, but traditionally, plain language—unless otherwise established—is given its ordinary meaning. *Cf. Markel Ins. Co. v. Muzyka*, 293 S.W.3d 380, 386 (Tex. App.—Fort Worth 2009, no pet.) (giving terms in an insurance policy their plain, ordinary meanings). To determine a word's ordinary meaning in a statute or other text, we are permitted to use the dictionary definition. *See, e.g.*, *Fort Worth Transp. Auth. v. Rodriguez*, 547 S.W.3d 830, 838 (Tex. 2018). "Spike[d]" can mean "to add an alcoholic beverage

---

[16]To commit an offense under this section, the person must "knowingly or intentionally tamper[] with a consumer product knowing that the consumer product will be offered for sale to the public" or as a gift to another. Tex. Penal Code Ann. § 22.09(b). The offense may also be committed by threat to do the same, and depending on the acts taken, the offense can be a first-, second-, or third-degree felony. *Id.* § 22.09(c), (d).

to" or "to add a foreign substance to." *Spike*, Merriam-Webster's Online Dictionary, https://www.merriam-webster.com/dictionary/spike (last visited Aug. 12, 2025). While we acknowledge that the parties disagree about the teas being directly brewed from kava leaves rather than later "spiked" with the same, the statement itself does not allege or reasonably imply the commission of a crime under the statute because a drink can be spiked without intending to cause serious bodily injury. *Compare id.*, *with* Tex. Penal Code Ann. § 22.09(a)(2). There is simply no allegation of such criminal intent in the Article.

And with regard to kratom, more specifically, although there was no criminal offense associated with its sale in Texas at the time of the Article's publication, the Legislature had enacted a criminal offense therefor, *see* Act of Apr. 21, 2023, 88th Leg., R.S., ch. 2, § 2, 2023 Tex. Gen. Laws 2, 2–3, but only for the distribution or sale of kratom products to minors, a crime the Article does not impute.[17] *See* Tex. Health & Safety Code Ann. §§ 444.001–.007.[18]

---

[17]We observe here that none of the parties brought this statute to our attention despite its clear relevance to our defamation analysis.

[18]We refer to the current numerical designation of this chapter—"Chapter 444. Manufacture, Distribution, and Sale of Kratom Products"—in this opinion, as the effective date for its redesignation to Chapter 445 is not in effect until September 1, 2025. *See* Act of May 14, 2025, 89th Leg., R.S., H.B. 1620, § 22.001 (to be codified as Tex. Health & Safety Code Chapter 445).

Effective September 1, 2023, Chapter 444 of the Texas Health and Safety Code imposed limitations on the manufacture, distribution, and sale of kratom products.[19] Section 444.002 prohibits kratom retailers[20] such as Darrigan from selling a kratom product that is not properly labeled "with product use directions necessary to ensure safe use of the product by a consumer, including the recommended serving size for the product." *Id.* § 444.002. Section 444.003 prohibits the sale of a kratom product that

> (1) is adulterated with a dangerous non-kratom substance affecting the quality or strength of the product to a degree that renders the product injurious to a consumer;

> (2) is contaminated with a poisonous or otherwise deleterious non-kratom substance, including any substance designated as a controlled substance by Chapter 481 (Texas Controlled Substance Act);

> (3) contains a level of 7-hyrdroxymitragynine in the alkaloid fraction that is greater than two percent of the overall alkaloid composition of the product; or

> (4) contains any synthetic alkaloids, including synthetic 7-hydroxymitragynine and synthetically derived compounds from a kratom plant.

*Id.* § 444.003.

---

[19] A "kratom product" is "a food, including an extract, capsule, or pill, containing any form of kratom" defined as "any part of the leaf of the plant Mitragyna speciosa." *Id.* § 444.001(2), (4). And "food" includes drinks. *Id.* § 444.001(1) (incorporating the definition of "food" set forth in Tex. Health & Safety Code Ann. § 431.002(16)(A)).

[20] A "kratom retailer" is "a kratom processor who sells kratom products to consumers or advertises, represents, or holds oneself out as a person who sells kratom products to consumers." *Id.* § 444.001(5). A "kratom processor" includes "a person who . . . advertises, represents, or holds oneself out as a . . . seller of kratom products." *Id.* § 444.001(3)(B).

A violation of any of these regulations triggers a civil penalty only, even if it is a repeat offense. *Id.* § 444.005. The only criminal offense imposed is for selling kratom products to minors, a Class C misdemeanor. *Id.* § 444.004. So, even had these regulations been in effect at the time of its publication and the Article had accused Darrigan of spiking his drinks with kratom product containing a level of 7-hydroxymitragynine in excess of the two percent threshold, he still would not have been defamed as a criminal.

We conclude that Darrigan has not shown by clear and specific evidence that the statement that he had a "controversial side gig running two cafés that sell drinks spiked with the mood-altering herbs kratom and kava" amounts to the accusation of a crime; and thus, he fails to establish the statement is textually defamatory.

ii. Gist

Darrigan's argument as to the defamatory gist of the Article consists of a blanket statement that Prospect "should have known the gist was false" and a general reference to the previously filed affidavits and declarations that "all" claim the statements about him in the Article were false.

The supreme court in *Tatum* determined that "gist" is "a publication or broadcast's main theme, central idea, thesis, or essence," and "implication" is "the inferential, illative, suggestive, or deductive meanings that may emerge from a publication or broadcast's discrete parts." 554 S.W.3d at 629. When a plaintiff raises an issue based on discrete implications, the proper appellate standard is "whether the

26

implication the plaintiff alleges is among the implications that the objectively reasonable reader would draw." *Id.* at 631. A party who seeks to recover based on a defamatory implication—either a gist or a discrete implication—must also point to "additional, affirmative evidence" within the publication itself that suggests the defendant "intends or endorses the defamatory inference." *Id.* at 635 (quoting *White v. Fraternal Order of Police*, 909 F.2d 512, 520 (D.C. Cir. 1990) (emphasis omitted)).

Gist requires that we construe the publication as a whole. *See id.* at 628. The title of the Article—"Shock Treatment in the Emergency Room: The Lehman-like collapse of a(nother) private equity-owned ER operator has physicians calling louder than ever for a strike"—is not particularly positive, but communicates that private-equity owned ER operators have been unreliable. As we have noted, the Article extensively details the fall of APP and the impact that fall has had on physicians and ERs. The Article then shifts to discuss the founders of APP—discussing their backgrounds and faults. At this point, the Article introduced Darrigan, calling him a "favored insider" and discussing his "r[i]se through the ranks," despite his "controversial" involvement with kava and kratom. The Article noted the kava franchisor litigation Darrigan was involved with and then stated that Darrigan had recently secured a former APP contract to staff CCMH. The Article then quoted a source who stated that a "smattering" of "such insider deals" has led to the suspicion that APP might be trying to discreetly award these contracts to company "favorites." The Article concluded by discussing a lawsuit eight Houston doctors filed against APP and the opinion of one physician that APP has "committed

27

crimes." These "crimes" are unspecified, but the lawsuit estimated that the eight physicians had been underpaid by almost $14 million.

Darrigan's entire argument on this point is that "[t]he gist of the [A]rticle is that [he] is one of several bad guys (in business and his practice of medicine), like [APP's founders], who is secretly still running APP." But this stretches the actual text of the Article. Darrigan's brief makes a general statement that each of the "fifteen declarations and affidavits"—that were attached to his response to Prospect's TCPA motion to dismiss—swore that "every one of the published statements . . . were false and defamatory as it related to [him]."

Ultimately, Darrigan makes no claim that the Article is substantially untrue in its portrayal of APP,[21] only that the inclusion of the statements about him made him look like "one of several bad guys." We agree that the Article certainly includes negative remarks about APP generally and lays no compliments on its founders. However, the overall gist of the Article is that *APP* has failed the doctors it employed, causing chaos. This alleged implication that Darrigan is "like" the founders is not one an objectively reasonable reader would draw. *See id.* at 631. The founders are discussed in much more colorful language. One being said to have engaged in transphobia, and the two others to be the sort who would "shake your hand with one hand and steal your wallet with

---

[21]In Darrigan's original petition, he stated that the "overall gist of the article was about the need for reform in healthcare finance laws." He also claimed that the paragraph that referred to him "seemed to be added to the rest of the [A]rticle as an afterthought."

the other." There were no such comments made about Darrigan's character. Darrigan was *not* identified as a founder of APP or as one of the persons responsible for APP's collapse.

Although unflattering to be mentioned along with APP's founders, the statements impute none of the failings of APP discussed in the Article onto Darrigan. *See Means v. ABCABCO, Inc.*, 315 S.W.3d 209, 214 (Tex. App.—Austin 2010, no pet.) (statements that are simply unflattering, abusive, annoying, irksome, embarrassing, or that only hurt the plaintiff's feelings are not actionable as defamation). The distinction between Darrigan and APP and its founders is apparent in the Article, making the alleged implication that Darrigan is "like" the founders or "like" APP an objectively unreasonable conclusion.

Further, Darrigan fails to point to any affirmative evidence within the publication to suggest that Prospect either intended to promote the defamatory meaning or endorsed it. *See Tatum*, 554 S.W.3d at 635. The portrayal of Darrigan, while potentially embarrassing and unflattering, does not show that Prospect intended to portray him as one of the parties responsible for APP's demise—and the resulting fallout. Thus, we hold that Darrigan also failed to establish textual defamation by gist.

b. Extrinsic Defamation

Defamation per quod applies to all defamatory statements that are not defamation per se. *See Lipsky*, 460 S.W.3d at 596. In a defamation case, "[a] TCPA nonmovant must provide enough detail . . . to establish the facts of when, where, and

29

what was said, the defamatory nature of the statements, and how they damaged [him]." *Stickland*, 2023 WL 8112889, at *19 (citing *Lipsky*, 460 S.W.3d at 591). Following *Tatum*, defamation per quod—now extrinsic defamation—is defamation that requires reference to extrinsic evidence. *Tatum*, 554 S.W.3d at 626. To prove an extrinsic-defamation case, the plaintiff *must* assert this claim in his petition to present it at trial, and the statement *must require* extrinsic evidence or explanatory circumstances to be defamatory at all. *Id.* at 625, 626.

Defamation requires (1) the publication of a false statement of fact to a third party, (2) that is defamatory of the plaintiff, (3) made with the requisite degree of fault. *Exxon Mobil Corp. v. Rincones*, 520 S.W.3d 572, 579 (Tex. 2017). Defamation may occur through slander—statements expressed orally—or through libel—statements expressed in writing or other graphic form. *Tatum*, 554 S.W.3d at 623–24. Additionally in any defamation case that is not textual defamation, or defamation per se, the plaintiff *must also* prove damages. *USA Lending*, 669 S.W.3d at 202 ("A general averment of loss, like any conclusory opinion, is not sufficient."); *Tatum*, 554 S.W.3d at 623, 626 (ratifying the continued distinction between defamation per se and defamation per quod as it relates to the plaintiff's burden to prove special damages); *Lipsky*, 460 S.W.3d at 593 (a general reference to economic losses or lost profits—without more—cannot satisfy the requirements under the TCPA); *Downing v. Burns*, 348 S.W.3d 415, 424 (Tex. App.—Houston [1st Dist.] 2011, no pet.) ("To recover for defamation *per quod*, a plaintiff must prove both the existence and amount of damages."). The mere suspicion that a plaintiff

30

has suffered damages will not suffice as evidence of damages. *See Villalobos*, 2019 WL 4892220, at \*5 (citing *Suarez v. City of Texas City*, 465 S.W.3d 623, 634 (Tex. 2015)).

Darrigan argues he suffered damages from "every one of the published statements"[22] about him—and the Article as a whole, which showed him in a "terrible light." To the extent that he is making an extrinsic defamation argument with this claim, it fails because Darrigan's evidence does not establish a prima facie case as to the essential element of damages. *See* Tex. Civ. Prac. & Rem. Code Ann. § 27.005(c) (the nonmovant must establish, by clear and specific evidence, the essential elements for each of his claims).

To establish damages, Darrigan relies on statements contained in the declarations submitted with his response to Prospect's TCPA motion to dismiss. Darrigan claims that he has established the following damages as a result of the statements made in the Article: (1) lost income of between $7,200 and $9,600 monthly, (2) a loss of approximately $3,520,000 over five years as a shareholder at Vital Emergency Partners, LLC (Vital), and (3) the loss of "substantial unliquidated damages" associated with the loss of a contract with AB Staffing Solutions. However, the declarations are ultimately

---

[22]We presume this refers to all of the alleged defamatory statements: (1) that Darrigan was sued for stealing trade secrets, (2) that Darrigan was a "favored insider" who "rose through the ranks," (3) that Darrigan secured a former APP contract at CCMH, (4) that Darrigan ran a "controversial side gig . . . sell[ing] drinks spiked with the mood-altering herbs kratom and kava," and (5) that Darrigan was promoting kava and kratom as a healthy alternative to alcohol, "contrary to every medical specialist as well as physician in the country."

insufficient to show damages by clear and specific evidence and do not establish a prima facie case as to damages. *See Lipsky*, 460 S.W.3d at 590 (internal quotation marks omitted).

Three of the declarations specifically discuss the three damages that Darrigan claims; however, the statements are either speculative and hypothetical or provide incomplete information to determine specific damages.

First, Darrigan claims he suffered lost income of between $7,200 and $9,600 monthly. The declaration from Jay Woody states that Darrigan worked in his independent emergency centers part time, but that he had concerns about Darrigan continuing to work with him "due to the light [the Article] painted [Darrigan] in." According to Woody, Darrigan worked for his company "at will," as a 1099-contract employee, but his company was no longer considering Darrigan for ongoing hire. Woody's use of the present tense in his declaration—signed in December 2023, more than four months after the Article was published at the end of July 2023—indicates that Darrigan may have still been employed in December, but that Woody would not have considered Darrigan for employment in the future. The timeframe of his employment—and the alleged termination of employment—is unclear.

Further, Woody stated that Darrigan's lost income "should be based on his usual 36–48 hours a month . . . at $200/hour, which equates to $7,200 to $9,600 per month." This statement is not clear enough to satisfy the clear and specific standard. The statement is not "unambiguous, sure, or free from doubt." *See id.* Instead, this

declaration presents only conclusory statements of Darrigan's alleged lost wages, rather than presenting evidence sufficient as a matter of law to establish what damages were suffered—at the very least up until the time of the dismissal hearing.[23] *See USA Lending*, 669 S.W.3d at 202–03.

Second, Darrigan claims that he lost approximately $3,520,000 over five years as a shareholder at Vital. David Copple, chief development officer of Emergency Care Partners, was planning to work with Darrigan to grow Vital. The two wanted to present Vital as an alternative to groups like APP. Copple's declaration states that he and Darrigan had identified fifteen hospitals to focus on, but that after the Article came out, he and Darrigan decided to cancel the project. Copple estimated that those contracts would have "conservatively" yielded approximately $300,000 in annual profit. Copple also identified that Darrigan would have received an additional $88,000 (approximately) per site, as a shareholder. Copple estimated that—for even half of the identified sites— this would yield approximately $3,520,000 over a five-year contract.

---

[23]There are too many unanswered questions that prevent us from calculating the alleged loss: Has Darrigan stopped working for Woody? When did that happen? How many months per year does, or did, Darrigan typically work for Woody—one, seven, all twelve? Were the hours Darrigan worked per month closer to 36 or 48? Was Darrigan scheduled for work after the Article came out—that is, did he anticipate a particular income the months after he was terminated? *But cf. USA Lending*, 669 S.W.3d at 201–03 (where evidence—expert testimony and financial records showing amount of expenses, fees, and other out-of-pocket costs incurred were attached to affidavit purporting damages—presented to trial court sufficiently established there was some specific, demonstrable injury suffered).

But the figures Copple presents are all hypothetical. Copple and Darrigan canceled the entire project before even presenting it to the fifteen identified hospitals. This does not amount to sufficient evidence to establish damages under the TCPA. *See USA Lending*, 669 S.W.3d at 202; *Villalobos*, 2019 WL 4892220, at \*5 (holding that there must be more than a mere suspicion that a plaintiff has suffered damages).

We note that Copple's declaration states that he and Darrigan were "in discussions" with a Texas hospital and that the hospital stopped responding after the Article came out. But Copple then avers that he "[could] only assume the decision was made based on the bad press." This assumption, without any evidence of its accuracy or any evidence of the cost of that loss, is also insufficient to support the essential element of damages. *See O'Hern v. Mughrabi*, 579 S.W.3d 594, 600 (Tex. App.—Houston [14th Dist.] 2019, no pet.) (holding that speculative or conjectural damages are not recoverable (citing *Reardon v. LightPath Techs., Inc.*, 183 S.W.3d 429, 442 (Tex. App.—Houston [14th Dist.] 2005, pet. denied))).

Third, Darrigan claims that he suffered "substantial unliquidated damages" associated with the loss of a contract with AB Staffing Solutions. Shelley Fuller's declaration states that after seeing the Article, the company she worked for, AB Staffing Solutions, "made the decision to discontinue any services moving forward that were connected to [Darrigan]," including Darrigan's new company, Elite. Fuller's declaration states that AB Staffing Solutions was contracted with APP when the Article came out in July 2023. The declaration does not state that AB Staffing Solutions was in

34

conversation to contract with Elite, or with Darrigan individually, only that it would not choose to do so in the future. This statement, like Copple's, is nothing more than mere suspicion that Darrigan may one day have suffered a loss. Thus, this evidence also fails to serve as clear and specific evidence of damages to support Darrigan's prima facie burden.

Because the information Darrigan relies on in the declarations is insufficient to establish a prima facie case for damages and Darrigan similarly failed in his textual defamation claims, we overrule Darrigan's fourth and fifth issues as they relate to Prospect.[24] *See Bookout*, 2022 WL 17173526, at *13 ("Statements that are conclusory or evidence that is speculative is not sufficient to carry the nonmovant's burden.").

---

[24]The trial court order granting the TCPA motion to dismiss also dismissed the secondary claims pled by Darrigan. Darrigan argues in his appellate brief that the trial court erred in dismissing his remaining claims and theories of liability: business disparagement, conspiracy, ratification, and aiding and abetting.

Both business disparagement and civil conspiracy require a showing of damages. *See Forbes Inc. v. Granada Bioscis., Inc.*, 124 S.W.3d 167, 170 (Tex. 2003) (business disparagement requires a finding of damages); *McShirley*, 2024 WL 976512, at *12 (holding that civil conspiracy requires that a plaintiff suffered injury because of the alleged wrongful act and that civil conspiracy is a derivative tort that survives or dies alongside the underlying tort alleged—thus, if the trial court did not err in dismissing the underlying tort, it did not err in dismissing the conspiracy claim). Because these claims are derivative of Darrigan's defamation claims, and we have held that Darrigan failed to establish a prima facie case as to damages, we likewise overrule the fourth and fifth issues as they relate to business disparagement and conspiracy.

Darrigan also made a blanket statement on appeal that the trial court erred in dismissing his ratification and aiding and abetting theories of liability when it granted the TCPA motion to dismiss for defamation; but curiously, Darrigan's only support of

D. Hansen

Darrigan's third issue and the remainder of his fourth and fifth issues relate to Hansen. The third issue claims that the trial court erred when it allowed Hansen to "join" Prospect's TCPA motion to dismiss. The fourth and fifth issues generally challenge the trial court's grant of the TCPA motions to dismiss, claiming that there was not sufficient evidence to do so.

1. Motion for Joinder

Hansen filed a "Joinder in Prospect Defendants' Motion to Dismiss Claims Pursuant to the Texas Citizens Participation Act" (Joinder), adopting and incorporating

---

this statement is that he "met his burden" as to his defamation claims. There is no caselaw to support this argument, nor is there any reference to the record where any prima facie case was established as to either of those theories. *See* Tex. R. App. P. 38.1(i) (briefing waiver); *see also NexPoint*, 674 S.W.3d at 446–47 ("Failure to provide citation to the record or citations for legal references constitutes inadequate briefing and waiver."). Considering that both theories of liability are based on the underlying claims of defamation pleaded by Darrigan, we also uphold the trial court's dismissal of these derivative claims. *See Provencio v. Paradigm Media, Inc.*, 44 S.W.3d 677, 683 (Tex. App.— El Paso 2001, no pet.) ("The same protections which the First Amendment affords defendants from libel claims also protects them from non-libel claims that are based on the same defamatory publication.").

We note that Darrigan does not discuss the dismissal of the tortious interference or negligence claims raised in his original petition. *See Gunderson v. Nat'l Indoor RV Ctrs., LLC*, No. 02-24-00025-CV, 2024 WL 3365233, at *2 (Tex. App.—Fort Worth July 11, 2024, pet. denied) (mem. op.) (holding that it is not the job of the appellate court to identify possible trial court error—that burden is on the party appealing the trial court's judgment); *see also* Tex. R. App. P. 38.1(i). Additionally, Darrigan acknowledges in his appellate brief that he waived the intentional infliction of emotional distress claims at trial. Thus, we do not address the trial court's dismissal of the tortious interference, negligence, or intentional infliction of emotional distress claims and theories, as they have not been raised on appeal.

36

"by reference the Prospect Defendants' Motion to Dismiss Pursuant to Chapter 27 of the Texas Civil Practice & Remedies Code." Darrigan filed no objections to Hansen's Joinder motion and did not object during the dismissal hearing. Instead, Darrigan responded to both Prospect's and Hansen's TCPA motions to dismiss. In general, a prequisite to presenting a complaint on appeal is a timely complaint to the trial court on the record that the trial court either ruled on or refused to rule on. *See* Tex. R. App. P. 33.1(a). As a result of his failure to object to Hansen's Joinder of Prospect's TCPA motion to dismiss, this complaint has not been preserved for appeal.[25] We overrule Darrigan's third issue.

2. TCPA Motion to Dismiss

Hansen's appellate brief—by way of adopting Prospect's argument[26]—contends that Darrigan's claims about the defamatory nature of the letter he drafted to the ABEM fall within the purview of the TCPA because it addressed a matter of public concern.

Darrigan sued Hansen for slander, claiming that Hansen made accusations about Darrigan to Tkacik. Specifically, Darrigan claims that Hansen told Tkacik that Darrigan

---

[25]We note that in his reply brief, Darrigan claims that Hansen's Joinder motion was untimely filed in the trial court. Similar to his challenge that the Joinder motion was insufficient, this argument was waived because Darrigan failed to raise it with the trial court. *See* Tex. R. App. P. 33.1(a), 38.3; *see also Stovall & Assocs. v. Hibbs Fin. Ctr., Ltd.*, 409 S.W.3d 790, 803 (Tex. App.—Dallas 2013, no pet.) ("[A]n issue raised for the first time in a reply brief is ordinarily waived and may not be considered by this [c]ourt.").

[26]The Texas Rules of Appellate Procedure allow any party to "join in or adopt by reference all or any part of a brief, petition, response, motion, or other document filed in an appellate court by another party in the same case." Tex. R. App. P. 9.7.

was spiking his client's drinks with a harmful substance and that he was a rising member of APP. Darrigan claimed in his original petition that these statements made him "appear unethical, immoral, and a [sic] criminal."

According to Tkacik's affidavit, "[m]ultiple sources," including Hansen, shared with her that there was a rumor that Darrigan had launched an independent staffing company and had acquired—or likely would acquire—a contract with CCMH, an ER previously staffed by APP. Hansen's affidavit also stated that he spoke to Tkacik about APP and knowledge of Darrigan. Hansen knew Darrigan as a regional medical director for APP who made attempts to convince physicians to sign on with APP during APP's purchase of Darrigan's prior company. Hansen stated that he later became aware of Darrigan's promotion of kava and kratom, and because he had researched the potentially harmful effects, he told Tkacik that he "[did] not believe it [was] responsible for any board-certified physician to promote" either substance. Hansen also admitted that he drafted the letter to ABEM in February 2023 with these concerns. Hansen then shared this letter with Tkacik because it included his own research into kava and kratom. According to Hansen, he received "no confirmation the letter was obtained nor reviewed by [ABEM]."

### a. Step One

As with Prospect, we first must determine the TCPA's applicability to the claims against Hansen. *See* Tex. Civ. Prac. & Rem. Code Ann. § 27.005(b). Hansen will have met his initial burden if he can show that Darrigan's suit is based on or in response to

38

the exercise of free speech or an act described in Section 27.010(b). The only argument presented in Darrigan's appellate brief against Hansen was that Hansen's Joinder motion did not adequately show that the TCPA applied.

It is illogical to determine that the TCPA would not apply to Hansen's statements in the ABEM letter about Darrigan's involvement with kava and kratom—or any alleged verbal statements about Darrigan's connection to APP—when we have determined that both are matters of public concern as to Prospect. As a result, because Darrigan's suit is based on statements directly related to matters of public concern under the TCPA, we conclude—as the trial court did—that Hansen satisfied his initial burden under the TCPA. *See id.* § 27.001(7)(C).

b. Step Two

Darrigan's original petition asserted a claim of slander[27] against Hansen, along with claims of tortious interference with prospective relationships, negligence, and intentional infliction of emotional distress, as well as the related theories of liability of conspiracy, ratification, and aiding and abetting. On appeal, and during the TCPA motion to dismiss hearing, Darrigan focused on defamation related to the statements

---

[27]In the original petition, Darrigan alleges that Hansen falsely told Tkacik that Darrigan was spiking his clients' drinks with harmful substances—accusing him of a crime. He also claims that Hansen falsely accused him of being a "rising member" of APP. And although he mentions Hansen's role in authoring the Word document in the "Facts" section, Darrigan makes no specific defamation claim against Hansen as to the Word document in his original petition.

in the Article. We have resolved Darrigan's "non-defamation" causes of action for Prospect above and see no reason for a different result for Hansen.

As for his defamation claims, we first note that Darrigan has provided no caselaw to support that a source for a story should be held liable for a claim of defamation when the claim against the publisher or author was not proven. Even more so, Darrigan does not discuss his prima facie case against Hansen in his appellate brief at all—he claims only that Hansen did not meet the initial burden under step one of the TCPA—which we have held otherwise.

To the extent that Darrigan's limited statement in his appellate brief—that the hyperlinked Word document defamed him explicitly and by implication—was meant to establish his prima facie case of textual defamation, we disagree. Under step two, Darrigan had the burden under the TCPA to show—with clear and specific evidence— that he could establish a prima facie case for the allegedly defamatory statements in the Word document. He has not done so. *See id.* § 27.005(c).

As we have stated, a claim for defamation requires (1) the publication of a false statement of fact to a third party, (2) that is defamatory of the plaintiff, (3) made with the requisite degree of fault, that, in some cases, (4) causes damages. *Rincones*, 520 S.W.3d at 579. If a statement is not verifiable as false, it cannot form a defamation claim. *Tatum*, 554 S.W.3d at 639. If a statement cannot be verified or cannot be understood to convey a verifiable fact, it is an opinion. *Id.* "Whether a statement is an opinion is a question of law." *Id.* (citing *Bentley*, 94 S.W.3d at 580). "[T]he sincerity of one's belief

40

does not transform an opinion into a fact." *Lilith Fund for Reprod. Equity v. Dickson*, 662 S.W.3d 355, 369 (Tex. 2023).

Aside from Darrigan's blatant fabrication that the Word document called for the ABEM to "strip" Darrigan of his medical license, he identifies only one statement as defamatory: "We feel the following products/drinks he's serving to the public disguised as a healthy alternative (promoted by him as such) to alcohol are both contrary to every medical specialist as well as physician in the country." We first hold that this is an opinion. A reasonable reader would not believe that this statement meant the writer spoke with "every" specialist and physician in the country—particularly without any citation to the same, when most other assertions were at least supported by some sort of purported source. *See id.* (citing *New Times, Inc. v. Isaacks*, 146 S.W.3d 144, 157–58 (Tex. 2004) (stressing that the test is not whether some readers may be misled, but whether the hypothetical reasonable reader could be misled)). Thus, without a statement of fact, the prima facie case for defamation fails.

But even if the statement is not an opinion and purports to convey a statement of fact, Darrigan provided no evidence to demonstrate that this statement is false. The Word document includes multiple links to various statements from Darrigan supporting the consumption of kava and kratom juxtaposed with various websites and statements that the consumption of either one can be dangerous. And we have already noted the contemporaneous enactment of Chapter 444 regulating the content and strength of kratom products to avoid injuries to consumers.

41

Darrigan does not contest the accuracy of the contrary sources cited by Hansen's letter, nor does he even acknowledge the Legislature's contemporaneous concerns about the safe consumption of kratom products. Instead, he contends that he simply promoted the sale of "low-dose, safe versions of the drinks he made from those leaves" and points to his own declaration as evidence of this claim. But his declaration does not provide evidence to establish that Hansen's statement or sources are false.

Darrigan points us to a paragraph in his declaration that explains that the drinks brewed at kava bars are "brewed from the leaves of kava and/or kratom," and customers order the drinks knowing this. The next paragraph states that the teas, traditionally made in Indonesia, are not the same as the "designer kratom-related drugs listed by the Defendant." Neither statement shows by clear and specific evidence that the statement in the Word document is false. *See Lipsky*, 460 S.W.3d at 592–93 ("Bare, baseless opinions do not create fact questions, and neither are they a sufficient substitute for the clear and specific evidence required to establish a prima facie case under the TCPA.").

Additionally, as we have held above for Prospect—Darrigan failed to establish the element of damages. *See* discussion *supra* C.2.b. The declarations do not mention the Word document linked to the Article, and none of the declarations adequately establish Darrigan's prima facie case of defamation as to damages. If a case fails on any essential element, dismissal is warranted under the TCPA. *See* Tex. Civ. Prac. & Rem. Code Ann. § 27.005(c); *see also NexPoint*, 674 S.W.3d at 445.

42

Because Darrigan did not present clear and specific evidence of his prima facie case as to the statement in the Word document, we also overrule the fourth and fifth issues as they relate to the claims against Hansen.[28]

### IV. Attorney's Fees and Sanctions Under the TCPA

Darrigan's sixth and seventh issues challenge the award of attorney's fees to Prospect and the award of sanctions to both Prospect and Hansen.

The TCPA provides that if a legal action is dismissed under Chapter 27, the trial court "shall award to the moving party court costs and reasonable attorney's fees incurred in defending against the legal action." Tex. Civ. Prac. & Rem. Code Ann. § 27.009(a)(1). Further, the trial court "may award to the moving party sanctions against the party who brought the legal action" as a means of deterrence for the party who brought the legal action from bringing a similar action. *Id.* § 27.009(a)(2). Prospect was

---

[28]Darrigan's original petition made the same derivative claims against Hansen that it made against Prospect. Because we have determined that all Darrigan's defamation claims fail, we incorporate our analysis of secondary claims and theories of liability as applied to Prospect to Hansen and likewise conclude that the trial court did not err in dismissing all the claims and theories of liability pleaded in Darrigan's original petition. *See* discussion *supra* footnote 24.

We further note that Darrigan alleges in his appellate brief that Hansen provided various statements to Prospect (1) that Darrigan was spiking drinks, (2) that Darrigan was an APP insider, (3) that Darrigan secured a contract from APP months before its collapse, and (4) that Darrigan was an APP favorite. Darrigan offers no citations to the record to support these allegations. *See* Tex. R. App. P. 38.1(i); Tex. Civ. Prac. & Rem. Code Ann. § 27.005(c); *see also Stickland*, 2023 WL 8112889, at *19 (if the nonmovant fails to meet his burden, the movant is entitled to dismissal). To the extent Darrigan intended to maintain these claims, we overrule the issues as related to these alleged statements as well.

43

awarded $118,280 in attorney's fees and $30,000 in sanctions. Hansen was awarded $21,918.50 in attorney's fees and $10,000 in sanctions.

A. Attorney's Fees

Darrigan complains that there was insufficient evidence to support Prospect's attorney's fees award. Specifically, he claims that Prospect's attorney's fees affidavit fails to contain any statement that the rates billed were reasonable and that the subject matter of the work completed was redacted, thus preventing the calculation of a reasonable award. We note that Darrigan makes no argument about the award of attorney's fees to Hansen.

1. Standard of Review and Applicable Law

If a trial court dismisses a suit under the TCPA, it "shall award to the moving party court costs and reasonable attorney's fees incurred." *Id.* § 27.009(a)(1). A reasonable fee is "one that is not excessive or extreme, but rather moderate or fair." *Sullivan v. Abraham*, 488 S.W.3d 294, 299 (Tex. 2016) (quoting *Garcia v. Gomez*, 319 S.W.3d 638, 642 (Tex. 2010)). What is "reasonable" rests in the sound discretion of the trial court. *See id.* "A trial court abuses its discretion when its award is arbitrary, unreasonable, and without reference to guiding principles." *Davis v. Crawford*, 700 S.W.3d 438, 452 (Tex. App.—Eastland 2024, no pet.). But no abuse of discretion occurs when the trial court decides based on conflicting evidence, so long as some substantive and probative evidence supports its decision. *Unifund CCR Partners v. Villa*, 299 S.W.3d 92, 97 (Tex. 2009); *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 211 (Tex. 2002) (op. on

44

reh'g). An appellate court cannot conclude that a trial court abused its discretion merely because the appellate court would have ruled differently in the same circumstances. *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995); *see also Low v. Henry*, 221 S.W.3d 609, 620 (Tex. 2007).

We are guided by the principles set forth in the Texas Supreme Court's opinion in *Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, 578 S.W.3d 469 (Tex. 2019). *See generally Mignogna v. Funimation Prods., LLC*, No. 02-19-00394-CV, 2022 WL 3486234, at *16–28 (Tex. App.—Fort Worth Aug. 18, 2022, pet. denied) (mem. op.) (relying on *Rohrmoos* in reviewing trial court's determination of reasonable attorney's fees in TCPA case). To determine a reasonable amount of attorney's fees under *Rohrmoos*, the factfinder must start by determining the reasonable hours worked multiplied by a reasonable hourly rate (the "lodestar analysis"); the fee claimant bears the burden of providing sufficient evidence of both. 578 S.W.3d at 498; *Mignogna*, 2022 WL 3486234, at *17; *see El Apple I, Ltd. v. Olivas*, 370 S.W.3d 757, 760 (Tex. 2012) (explaining that the trial court calculates the base lodestar amount). Sufficient evidence must address, at a minimum, (1) the particular services performed; (2) who performed those services; (3) approximately when the services were performed; (4) the reasonable amount of time required to perform the services; and (5) the reasonable hourly rate for each person performing the services. *Rohrmoos*, 578 S.W.3d at 498, 502.

"[T]here is a presumption that the base lodestar calculation, when supported by sufficient evidence, reflects the reasonable and necessary attorney's fees that can be

shifted to the non-prevailing party." *Id.* at 499. Most *Arthur Andersen*[29] factors—"the time and labor required"; "the novelty and difficulty of the questions involved"; "the skill required to perform the legal service properly"; "the fee customarily charged in the locality for similar legal services"; "the amount involved"; "the experience, reputation, and ability of the lawyer or lawyers performing the services"; "whether the fee is fixed or contingent on results obtained"; "the uncertainty of collection before the legal services have been rendered"; and "results obtained"—are already incorporated into the base lodestar. *Id.* at 500. "[A] fee opponent [who] seeks a reduction [from the base lodestar amount], . . . bears the burden of providing specific evidence to overcome the presumptive reasonableness of the base lodestar figure." *Id.* at 501.

Even if the attorney's fees request is not contested, the trial court is not obligated to award the requested amount, but the award must bear a reasonable relationship to the fees in controversy. *Iola Barker v. Hurst*, 632 S.W.3d 175, 193 (Tex. App.—Houston [1st Dist.] 2021, no pet.). Thus, when determining an appropriate fee award, the trial court is entitled to examine the entire record and to view the matter in light of the amount in controversy, the nature of the case, and his or her personal experience as a lawyer or judge. *Mignogna*, 2022 WL 3486234, at *17 (citing *Iola Barker*, 632 S.W.3d at 193–94).

---

[29] *See Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812 (Tex. 1997) (op. on reh'g).

2. Discussion

The trial court awarded $118,280 in attorney's fees to Prospect. We have already held that the trial court did not err in granting Prospect's motion to dismiss under the TCPA, the grant of which mandates an award of attorney's fees. *See* Tex. Civ. Prac. & Rem. Code Ann. § 27.009(a)(1). Thus, the only remaining question is whether the trial court's award of $118,280 in attorney's fees to Prospect was reasonable. *See id.*

In support of its claim for attorney's fees, Prospect relied on the affidavit of its lead attorney, Catherine L. Robb. Robb was assisted by a partner, Laura Prather, and an associate, Reid Pillifant, at the same law firm. The affidavit included billing rates for each of the three attorneys,[30] as well as the paralegal[31] who provided support—with the rates ranging from $210/hour to $495/hour. According to Robb's affidavit, performance of specific tasks was tracked in detailed billing statements and showed a total of 324.30 hours worked through December 31, 2023. Calculation of the hourly rates for each professional to the individual amounts of time for each specified task reflected attorney's fees of $118,280 for professional services connected to the

---

[30]The attorney time was billed at the following rates: $495/hour (Prather), $400/hour (Robb), and $320/hour (Pillifant). According to Robb, these were discounted rates due to the relationship the law firm has with the insurer for Prospect. The standard rates of the attorneys who worked on this matter were $875/hour, $725/hour, and $650/hour—respectively.

[31]The paralegal time—for a practitioner with more than 10 years of experience as an attorney and paralegal—was billed at $210/hour. Additionally, Robb indicated that the paralegal's standard rate was $420/hour.

representation. Additionally, Robb included a $4,000 fee, incurred for the preparation of the attorney's fees affidavit and resolution of the attorney's fees matter, as well as court costs of $21.28. The total amount requested for the attorney's fees award was $122,301.28.

The affidavit included a statement that "[t]he rates charged in this matter are comparable to or lower than rates charged by legal professionals with similar levels of experience at similar law firms throughout Texas, including Denton County," for representation of specialized First Amendment work. Billing statements were not attached, but Robb stated the invoices could be made available to the trial court upon request, after redaction.[32] The affidavit also included statements addressing each of the *Arthur Andersen* factors.

Darrigan objected to Robb's affidavit because it did not include invoices or proof of how the hours and attorney's fees were accrued and calculated. Darrigan also challenged the reasonableness of the rates in Denton County for the same reason: that the calculation could not be evaluated without an invoice or statement. Darrigan's attorney created an affidavit stating that the requested fees were not reasonable or necessary and there was "no way for [him] or [his] client to know whether any of the

---

[32]These invoices were later provided to the trial court—with a supplemental affidavit —detailing the services performed, the length of time, the dates performed, and by whom.

charges [were] duplicative, erroneous, unnecessary, excessive, or just inadequately documented" without an invoice.

Following the objections and motion to strike, Robb filed a supplemental affidavit and copies of the invoices for the work completed.[33] Darrigan objected to the redacted portions of the invoices, claiming that the redactions removed the "subject matter of the work." There is no record of a hearing, but the trial court then granted Prospect's—and Robb's—request for attorney's fees and costs, awarding $118,280 in reasonable attorney's fees. The trial court denied recovery for the $4,000 fee to prepare the attorney's fees affidavit and the additional court costs identified and implicitly denied the request for contingent appellate attorney's fees.

On appeal, Darrigan has not alleged that Robb's affidavit itself is defective or insufficient. Instead, he makes only three challenges to the $118,280 attorney's fee award: (1) that the affidavit failed to contain a statement that the rates billed were reasonable in Denton County; (2) that the billing entries had the subject matter of the work completed redacted throughout each invoice; and (3) that the award was not supported by the evidence. All three arguments fail.

---

[33]Robb's supplemental filing was accepted by the trial court and resolved Darrigan's complaint that Robb's first affidavit lacked proper documentation to support the work completed and the length of time tasks were worked on and by whom. That record was properly before the trial court, and we likewise considered the evidence on appeal.

First, Robb's initial affidavit *does* include a statement that the rates were reasonable in Denton County.[34] Darrigan provided no evidence to support that such a statement by Robb would be demonstrably false. At most, this could be construed as a challenge to Robb's statement that the fees are reasonable in Denton County—a challenge the trial court was entitled to resolve in Prospect's favor. *See Unifund*, 299 S.W.3d at 97.

Second, although there are redacted portions of the invoices submitted, the tasks are identifiable. For example, one description reads "Review and analyze discovery requests served over weekend and review and update deadlines and communicate with clients [redacted]." Another description reads, "Review multiple correspondence from reporter and sources concerning [redacted]." Other descriptions have no redactions at all: "Continue reviewing and considering Affidavits for inclusion in Anti-SLAPP Motion (1.6)" and "Review and revise Motion to Strike evidence in D. Darrigan's Response to Motion to Dismiss." We conclude that the invoice descriptions are discernable even with redactions. Further, we note that the trial court could have filled in the gaps left by the redactions with its knowledge of the work necessary to file the TCPA motions. *See Isomeric Indus., Inc. v. Triple Crown Res., LLC*, No. 01-22-00768-CV, 2023 WL 6884172, at *6 (Tex. App.—Houston [1st Dist.] Oct. 19, 2023, no pet.) (mem.

---

[34]"The rates charged in this matter are comparable to or lower than rates charged by legal professionals with similar levels of experience at similar law firms throughout Texas, including Denton County, for highly specialized First Amendment work such as the work performed for Prospect Defendants in this case."

op.) (holding that a trial court judge may draw on his or her own experience to determine whether tasks performed and fees incurred are reasonable). In any event, Darrigan did not complain about specific entries in the trial court and has not complained about any that are undeterminable on appeal.

Finally, Darrigan makes the blanket statement that "the trial court's ruling is not supported by any evidence." We disagree. Robb's supplemental affidavit attaches more than 25 pages of invoices detailing the work, time spent, when, and by whom concerning the representation of Prospect during this case. Darrigan identifies no entries that detail tasks not performed in the course of this representation, or any duplicate entries of work performed.

Having resolved Darrigan's complaints, and considering the affidavits and invoices provided by Robb and Prospect, we conclude that the trial court did not abuse its discretion in awarding $118,280 in attorney's fees to Prospect.

B. Sanctions

1. Standard of Review and Applicable Law

"Sanctions are incorporated into the TCPA's framework because dismissal alone might not suffice to deter a SLAPP suit." *Montoya Frazier v. Maxwell*, No. 02-23-00103-CV, 2025 WL 494699, at *11 (Tex. App.—Fort Worth Feb. 13, 2025, pet. filed) (en banc). An award of sanctions in a TCPA case is also reviewed for an abuse of discretion. *Maynard v. Bankston*, No. 04-24-00074-CV, 2025 WL 1452565, at *7 (Tex. App.—San Antonio May 21, 2025, no pet. h.) (citing *ADB Int., LLC v. Wallace*, 606 S.W.3d 413,

51

443 (Tex. App.—Houston [1st Dist.] 2020, pet. denied)). In determining whether the trial court abused its discretion, we consider whether the facts present an appropriate case for the trial court's action and whether the trial judge acted arbitrarily, unreasonably, or without reference to guiding rules or principles. *See Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985). We may not conclude that the trial court abused its discretion merely because we might have decided a factual question differently from the trial court. *Id.* at 242. The award of sanctions is not mandatory—as the award of attorney's fees is—and is meant to deter a similar legal action after it has been dismissed under the TCPA. *See* Tex. Civ. Prac. & Rem. Code Ann. § 27.009(a)(2).

"[T]he statute does not specify a particular formula, amount, or guideline for determining the sanctions amount other than to say that the amount is to be sufficient to deter the party who brought the legal action from bringing similar actions." *Tatum v. Hersh*, 559 S.W.3d 581, 587 (Tex. App.—Dallas 2018, no pet.) (op. on remand). The award must be large enough to serve the purpose identified in the statute, but the mere fact that an award is large does not render it excessive. *Baukus v. Engle*, Nos. 14-22-00705-CV, 14-22-00951-CV, 2025 WL 924570, at *16 (Tex. App.—Houston [14th Dist.] Mar. 27, 2025, no pet.) (mem. op.). "Factors relevant in considering whether to impose sanctions include, among others, the amount of attorney's fees and costs incurred, the plaintiff's history of bringing similar actions, and any aggravating misconduct." *Cobb Dev. v. McCabe*, No. 03-21-00524-CV, 2023 WL 4003513, at *13

(Tex. App.—Austin June 15, 2023, pet. denied) (mem. op.) (internal citations omitted). The trial court is also permitted to consider the history of the litigation itself. *1st & Trinity Super Majority, LLC v. Milligan*, 657 S.W.3d 349, 380 (Tex. App.—El Paso 2022, no pet.). The TCPA "does not expressly require the trial court to explain how it reached its determination." *Kinney v. BCG Att'y Search, Inc.*, No. 03-12-00579-CV, 2014 WL 1432012, at *11 (Tex. App.—Austin Apr. 11, 2014, pet. denied) (mem. op. on reh'g); *see Mishkoff v. Garrett*, No. 05-22-01063-CV, 2024 WL 770142, at *6 (Tex. App.—Dallas Feb. 26, 2024, pet. denied) (mem. op.) (explaining that trial-court findings are required by Section 27.007 when sanctions are awarded under Section 27.009(b) but not when awarded under Section 27.009(a)(2)).

### 2. Discussion

Prospect sought sanctions in the affidavit for attorney's fees, "due to [Darrigan's] clear inclination to use litigation to silence his critics, and his litigious nature, in general." Hansen's affidavits for attorney's fees did not include a request for sanctions. Darrigan objected to an award of sanctions—to either Prospect or Hansen—maintaining that the trial court should not have dismissed his claims at all.

The trial court awarded a total of $40,000 in sanctions—$30,000 to Prospect and $10,000 to Hansen. On appeal, Darrigan challenges the total sanctions award, claiming it was an abuse of discretion because there is insufficient evidence to support it. That is the entirety of Darrigan's objection to the sanctions award.

Although Darrigan fails to cite authority to support his argument, in the final award for attorney's fees and sanctions, the trial court cited the applicable standard for awarding sanctions to Prospect and to Hansen pursuant to subsection (a)(2).[35] *See* Tex. Civ. Prac. & Rem. Code Ann. § 27.009(a)(2) (stating the trial court "may award sanctions . . . as the [trial] court determines sufficient to deter the party who brought the legal action from bringing similar actions"); *see also Rich v. Range Res. Corp.*, 535 S.W.3d 610, 613 (Tex. App.—Fort Worth 2017, pet. denied). The award of sanctions under the TCPA is at the discretion of the trial court. *See Landry's, Inc. v. Animal Legal Defense Fund*, 631 S.W.3d 40, 46 (Tex. 2021).

The trial court is permitted to consider the history of the litigation itself, *Milligan*, 657 S.W.3d at 380, and does not need to explain how it reached its determination, *Kinney*, 2014 WL 1432012, at *11. Considering that (1) Darrigan brought forth nine claims and theories of liability, but only put forth argument as to two (both for defamation—libel and slander); (2) Darrigan complains about statements in the Article that he did not originally ask Prospect to change; and (3) Darrigan exaggerated the statements made "against him" when arguing before the trial court, we cannot conclude that the trial court abused its discretion by awarding $40,000 in sanctions to Prospect and to Hansen for the purpose of discouraging future similar suits. *See Cobb Dev.*, 2023

---

[35]In the "Second Corrected Order Granting Attorney's Fees and Costs," the trial court ordered that sanctions be recovered "based on the evidence admitted and considered in this case" and found "the amount that is sufficient and necessary to deter [Darrigan] from bringing similar actions."

WL 4003513, at *13 (upholding $60,000 sanctions award where the trial court considered the history of the litigation and the sanctions award was less than half of the attorney's fees award).

Because we have resolved Darrigan's complaints as to attorney's fees and sanctions, we overrule issues six and seven.

## V. Conclusion

Having overruled each of Darrigan's issues on appeal, we affirm the orders of the trial court.

/s/ Wade Birdwell

Wade Birdwell
Justice

Delivered: August 21, 2025